385-07/MEU/MAM

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
NANJING PETROLEUM
TRANSPORTATION  CO. LTD.
80 Pine Street
New York, NY  10005
(212) 425-1900
(212) 425-1901 fax

Michael E. Unger (MU 0045)
Manuel A. Molina (MM 1017)



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

NANJING PETROLEUM
TRANSPORTATION CO. LTD.,

<div align="right">


07 CIV    (    )

**VERIFIED COMPLAINT**
</div>

                                        Plaintiff,

                    -against -

GLASFORD SHIPPING LTD.,

                                        Defendant.
------------------------------------------------------------x

        Plaintiff   NANJING   PETROLEUM   TRANSPORTATION   CO.   LTD.

("NANJING") through its attorneys Freehill Hogan & Mahar, LLP, as and for its

Verified Complaint against Defendant GLASFORD SHIPPING LTD. ("GLASFORD"),

alleges upon information and belief as follows:

        1.        This is an admiralty and maritime claim within the meaning of Rule 9(h)

of the Federal Rules of Civil Procedure in that it involves a claim for the breach of a

maritime contract by Defendant.  The case also falls within the Court's admiralty and

maritime jurisdiction pursuant to 28 U.S.C. §1333.  Jurisdiction is also proper pursuant to

the  Court's  federal  question  jurisdiction  pursuant  to  28  U.S.C.  §1331.   Federal

jurisdiction also exists because the action arises under the New York Convention on the

Recognition and Enforcement of Foreign Arbitral Awards at 9 U.S.C. §201 *et seq.* and/or the Federal Arbitration Act, 9 U.S.C. §1 *et seq.*

2.    At all times relevant hereto, Plaintiff NANJING was and still is a foreign business entity duly organized and existing under the laws of a foreign country with a place of business at Jian Ling Building 324, Zhongshan Beilu Gulou Qu, Nanjing, Jiangsu 210003.

3.    At all times relevant hereto, Defendant GLASFORD was and still is a foreign business entity duly organized and existing under the laws of a foreign country with a registered office c/o PETROCHINA INTERNATIONAL CO. LTD., Petrochina International Plaza No. 27 Chenj Fang Road, Beijing 100032, China.

4.    On or about April 24, 2003, NANJING, as owner, and GLASFORD, as charterer, entered into a maritime contract on an amended ASBATANKVOY (1997) voyage charter party form for the use and operation of the M/V TIAN XING ZHOU ("the charter party"). The voyage charter contemplated the carriage of a shipment of two grades of crude oil from Kasim, Indonesia and Bunga Kekwa, Malaysia to Jinzhou, the People's Republic of China.

6.    Clause K, Part I of the charter party required that all disputes between NANJING and GLASFORD be referred to arbitration in London, with English law to apply.

7.    A dispute arose between NANJING and GLASFORD under the charter party regarding NANJING's claim for indemnity in respect of the liability that NANJING had incurred to cargo interests in China and in respect of the legal and associated costs incurred by NANJING in relation to the proceedings commenced by cargo interests in

China.  The dispute was subsequently submitted to a Panel of arbitrators in London, as per Clause K, Part I of the charter party.

8.    On or about July 10, 2007, the Panel of London arbitrators issued a Final Arbitration Award With Reasons in NANJING's favor and against GLASFORD awarding NANJING damages on its claim, together with compounded interest thereon and costs.  A copy of the award is attached hereto as Exhibit 1.

9.    Despite due demand, the amounts awarded to NANJING in London arbitration remain due and outstanding.

10.    NANJING has fulfilled all obligations required of it under the charter party.

11.    This action is brought to obtain jurisdiction over Defendant GLASFORD to enforce the London arbitration award, as well as to obtain security in favor of Plaintiff NANJING in respect to its claims against Defendant and the aforementioned London arbitration award.

12.    After investigation, Defendant GLASFORD cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendant has, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, credits, debts, wire transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant ("ASSETS"), including but not limited to ASSETS at, being transferred through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Attachment issued herein.

13.    As nearly as presently can be computed, the total amount sought to be attached pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims by NANJING against GLASFORD includes:

(i)    Final Arbitration Award on the Merits concerning NANJING's claims in the sum of $139,936.64  (Award at pp. 3(B) and 4(C) );

(ii)    Final Arbitration Award on the Merits concerning interest on the above sum calculated from April 12, 2005 to August 7, 2007 at the rate of 7.25 % per annum compounded quarterly, in the sum of $26,242.20 and continuing to accrue at $37.00 per day until payment is made (Award at p. 4(C));

(iii)    Final Arbitration Award on the Merits concerning the arbitrator appointment fee of $255.31 and legal costs of the arbitration, which costs NANJING's English solicitors calculate to be $20,000 and (Award at p.4(D)(i));

(iv)    Final Arbitration Award on the Merits concerning interest on the above sums, calculated from July 10, 2007, to August 7, 2007 at the rate of 7.75 % per annum compounded quarterly, in the sum of $111.82, and continuing to accrue at $4.30 per day until payment is made (Award at p. 4(D)(iii));

(v)    Estimated attorneys' fees and costs in connection with these proceedings in the sum of $15,000.

WHEREFORE, Plaintiff NANJING prays:

a.    That process in due form of law according to the practice of this Court may issue against Defendant GLASFORD, citing it to appear and answer the foregoing, failing which a default will be taken against it for the

principal amount of the claim of $186,545.97, plus interest, costs and attorneys' fees;

b.  That if the Defendant cannot be found within this District pursuant to Supplemental Rule B, all tangible or intangible property of the Defendant as described herein, up to and including the amount of the claims of **$201,545.97**, be restrained and attached, including, but not limited to any cash, funds, credits, debts, wire transfers, accounts, letters of credit, freights, charter hire, sub-charter hire, and/or other assets of, belonging to, due, held or being transferred to or for the benefit of the Defendant (collectively hereinafter "ASSETS") including, but not limited to such ASSETS as may be held, received or transferred in its own name or as may be held, received or transferred for its benefit at, through or within the possession, custody or control of banking institutions and any other garnishees upon whom a copy of the Process of Maritime Attachment and Garnishment issued herein may be served;

c.  That the Court enter an order confirming the Award as Judgment of this Court; and

d.  That Plaintiff have such other, further and different relief as this Court

may deem just and proper.

Dated: New York, New York
       August 8, 2007

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
NANJING PETROLEUM
TRANSPORTATION CO. LTD.

By:  _____
     Michael E. Unger (MU 0045)
     Manuel A. Molina (MM 1017)
     80 Pine Street
     New York, NY 10005
     Tel: (212) 425-1900

## ATTORNEY VERIFICATION

State of New York    )
                     ) ss.:
County of New York   )

      Michael E. Unger, being duly sworn, deposes and says:

    1.    I am a member of the law firm of Freehill Hogan & Mahar, LLP, attorneys for the Plaintiff in this action. I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

    2.    The sources of my information and the grounds for my belief are communications from our client and documents provided by our client regarding this claim.

    3.    The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within the State of New York.

                                          Michael E. Unger

Sworn to before me this
8th day of August, 2007

NOTARY PUBLIC

CLARE HENRY
Notary Public, State of New York
No. 01HE4831498
Qualified in Kings County
Certificate in New York County
Commission Expires October 31, 2009

# EXHIBIT 1

Fax sent by : 02089773052                    01-08-07 15:09   Pg: 2/21
Case 1:07-cv-07062-CM   Document 1   Filed 08/08/2007   Page 9 of 27
PATRICK ODONOVAN

IN THE MATTER OF THE ARBITRATION ACT 1996

AND

IN THE MATTER OF AN ARBITRATION

BETWEEN:-


NANJING PETROLEUM TRANSPORTATION CO. LTD.

of Nanjing                                    Claimants

(Owners)


- and -


GLASFORD SHIPPING LTD.

of Hong Kong S.A.R.                           Respondents

(Charterers)


"TIAN XING ZHOU"

Charterparty dated 24th April 2003


---

FINAL ARBITRATION AWARD

---


WHEREAS:


1.  The Claimants (hereinafter referred to as "the Owners") contend that, by a
    tanker voyage charterparty dated Singapore, 24th April 2003 on an amended
    ASBATANKVOY (1997) form with amendments and a number of additional

– 2 –

clauses, they chartered the motor vessel "TIAN XING ZHOU" to the Respondents (hereinafter referred to as "the Charterers") for the carriage of a cargo of *"Minimum 58,000mt, Charterers' option upto full cargo, 1 (one)/2 (two) grades crude oil"* from Kasim, Indonesia and Bunga Kekwa, Malaysia to (in the event) Jinzhou, PRC on terms and conditions more particularly set out in the said charterparty. The Charterers admit the existence of a contract with the Owners but it is their case that the contract was not that contained in the charterparty dated 24th April 2003.

2.  Clause K of Part I of the charterparty, Clause 24 of Part II and China Oil Standard Chartering Term 9 (incorporated into the charterparty) provided for disputes to be referred to three arbitrators in London in a manner more particularly set out therein and for English law to apply.

3.  Disputes, hereinafter more particularly defined, arose between the parties for the determination of which the Owners appointed me, Robert Gaisford of Bramdean, Stonegate, Wadhurst, East Sussex, TN5 7EP and the Charterers appointed me, Patrick O'Donovan of Churcham House, 1 Bridgeman Road, Teddington, Middlesex, TW11 9AJ to be the arbitrators respectively nominated by them. Subsequently, by way of variation of the arbitration agreement referred to in Recital 2 above, the parties agreed in writing that if we found ourselves in agreement there was no need to appoint a third arbitrator. We are both full members of the London Maritime Arbitrators Association ("the LMAA") and members of The Baltic Exchange in the City of London. We both accepted appointment on the basis of the LMAA Terms (2002).

4.  Pursuant to the provisions of the charterparty referred to in Recital 2 above and/or the provisions of paragraph 6(b) of the LMAA Terms (2002) the seat of the arbitration is in England.

5.  The dispute referred to us concerned the Owners' claim for an indemnity (or alternatively damages) in the sum of RMB680,000 and US$50,049 in respect of a liability that they say they have incurred to cargo interests in China and in respect of legal and associated costs incurred in relation to those proceedings. The Owners claim interest on these sums and their costs.

6.  The Charterers deny liability for the sums claimed or any sum.

7.  The reference proceeded by the exchange of written submissions between the Owners' London solicitors and the Charterers' lawyers in Beijing. Neither party asked for an oral hearing, both agreeing in writing that we could proceed to our Award on the basis of the written submissions and documents provided to us. The Charterers requested a Reasoned Award and accordingly our Reasons are attached hereto and form part of this our Award.

**NOW WE** the said Arbitrators, Robert Gaisford and Patrick O'Donovan, having accepted the burden of this reference and having carefully and conscientiously considered the submissions and evidence (all documentary) placed before us and having given due weight thereto and finding ourselves in agreement (thereby, pursuant to the varied arbitration agreement referred to in Recital 3 above, having no need to appoint a third arbitrator) **DO HEREBY MAKE, ISSUE AND PUBLISH** this our joint and agreed **FINAL ARBITRATION AWARD** as follows:

(A)  **WE FIND AND HOLD AND DECLARE** that the relevant contract between the parties is the ASBATANKVOY charterparty dated Singapore, 24th April 2003 relied upon by the Owners.

(B)  **WE FURTHER FIND AND HOLD** that the Owners' claims in the sums of RMB680,000 and US$50,049 succeed in full.

-4-

(C) **WE THEREFORE AWARD AND ADJUDGE** that the Charterers shall forthwith pay to the Owners the said sums of RMB680,000 (Six Hundred and Eighty Thousand Yuan) and US$50,049 (Fifty Thousand and Forty-Nine United States Dollars) **PLUS** interest on both sums at the rate of 7.25% (seven and one-quarter per cent) per annum or pro rata compounded at three-monthly rests from 12th April 2005 until the date of payment.

(D) **WE FURTHER AWARD AND ADJUDGE:**

    (i) that the Charterers shall bear their own costs and pay the Owners' costs of the reference (and the Owners' said costs may be determined by us or in the High Court in London in the Owners' option on the basis set out in s.63(5) of the Arbitration Act 1996 for which purpose **WE RESERVE JURISDICTION** to make a subsequent Award of Costs);

    (ii) that the Charterers shall further bear and pay the costs of this our Final Arbitration Award in the sum of £7,440 (inclusive of our fees and interlocutory charges) **PROVIDED ALWAYS** that if, in the first instance, the Owners shall have paid any amount in respect of the costs of this our Final Arbitration Award they shall be entitled to immediate reimbursement by the Charterers of any sum or sums so paid; **AND**

    (iii) that the Charterers shall pay interest on any sums payable to the Owners under sub-paragraphs D(i) and (ii) above at the rate of 7.75% (seven and three-quarters per cent) per annum or pro rata compounded at three-monthly rests from the date of this our Final Arbitration Award until the date of payment or reimbursement as appropriate.

- 5 –

**GIVEN** under our hands at the seat of the arbitration in London, England
this *10ᵗʰ* day of *July* 2007.

_____                    _____
Robert Gaisford                                                              Witness


_____                    _____
Patrick O'Donovan                                                         Witness

"TIAN XING ZHOU"

Charterparty dated 24th April 2003

REASONS FOR AND FORMING PART OF
FINAL ARBITRATION AWARD

## The factual background

1.    The Owners, Nanjing Petroleum Transportation Co. Ltd. ("the Owners")
chartered the "TIAN XING ZHOU", a tanker with a deadweight of
69,9987mt, built in 1993 and flying the Chinese flag, to Glasford Shipping
Limited of Hong Kong ("the Charterers") for a voyage from one safe port
Kasim followed by one safe port Bunga Kekwa to Jinzhou, China with a
cargo of minimum 58,000mt of 1/2 grades of Walio and Bunga Kekwa crude
oil. The Owners claimed that the terms of the charterparty were those set
out in an amended Asbatankvoy charterparty while the Charterers
maintained that they were set out in an exchange of correspondence
between the parties.

2.    According to the two bills of lading issued at Kasim on 29th April 2003, a
cargo of about 220,000 bbls (net at 60° F) of Walio Crude Oil was loaded at
the port of Kasim bound for Jinzhou, China. Subsequently, 260,267 bbls of
Bunga Kekwa crude were loaded. The ullage report at Kasim dated 29th
April 2003 reflected that there was a quantity of free water of 731 bbls in

- 2 -

the cargo. The ullage report at the discharge port recorded that the free water content in the cargo had risen to 8817 bbls. The receivers brought a claim under the cargo policy for shortage, which claim was settled by their insurers, Ping An Insurance Company, for US$169,765 whereupon the subrogated insurers brought proceedings in the Wuhan Maritime Court against the Owners to recover the above amount — which proceedings were settled in the amount of RMB680,000 (approximately 50% of the claimed amount) as evidenced by a Mediation Agreement issued by the Court dated 12th April 2005.

3.    The Owners claimed an indemnity from the Charterers under the charterparty in the amount of RMB680,000 together with the legal costs of US$43,769 incurred in defending the proceedings in China and P&I Correspondents' and surveyors' costs of US$6,280. The Charterers denied that there was any free water in the cargo on loading. Even if there was free water in the cargo, they argued that the Owners' claim was against the shippers under the bills; they were not the shippers. Moreover, any loss (they argued) resulted from the Owners' failure to properly clause the bills of lading to reflect the water content. In the circumstances, they denied that they had any obligation to indemnify the Owners under the charterparty. They also argued that (i) the Tribunal had no jurisdiction, (ii) the claim was time-barred and (iii) the Owners had acted as volunteers in settling the claim in respect of which they had no legal liability to pay.

4.    Arising from the above the following issues arose.

- **Preliminary issues**

    (i)    Did the Tribunal have any jurisdiction to determine the dispute?

    (ii)    Was the claim time-barred?

- 3 -

- **Substantive issues**

(iii)   Was there free water on the cargo on discharge?

(iv)   If yes, where did the water come from?

(v)    Were the Owners entitled to an indemnity under the terms of the charterparty?

(vi)   Did the Owners act as volunteers in settling the claim?

(vii)   Quantum.

## The relevant contractual provisions

5.   The charterparty provided, where relevant, as follows:

Part II
"20.   ISSUANCE AND TERMS OF BILLS OF LADING.
(a)   The Master shall, upon request, sign Bills of Lading in the form appearing below for all cargo shipped but without prejudice to the rights of the Owner and Charterer under the terms of this Charter.

...

24.   ARBITRATION. Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of London ... pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Charterer and one by the two so chosen. The decision of any two of the three on any point or points shall be final.

...

CHINA OIL STANDARD CHARTERING TERMS NO.1-11:-

...

9.   SHOULD A DISPUTE ARISE BETWEEN OWNERS AND THE CHARTERERS BOTH PARTIES WILL ENDEAVOUR TO SETTLE THE MATTER IN DISPUTE AMICABLY OTHERWISE SAME TO BE SETTLED IN LONDON BY ARBITRATION AS PER CHARTER PARTY.

...

CHINA OIL CLAUSES NO. 1-18

...

4.   AMOCO CLAIMS CLAUSE – 90 DAYS

-4-

*OWNERS AGREE TO INVOICE CHARTERERS FOR ALL CHARGES AND CLAIMS ARISING FROM THIS CHARTER PARTY, INCLUDING BUT NOT LIMITED TO, DEMURRAGE, DEADFREIGHT, DEVIATION AND SHIFTING, WITHIN NINETY (90) DAYS FROM THE COMPLETION OF DISCHARGE. CHARTERERS WILL NOT BE RESPONSIBLE FOR ANY CHARGES OR CLAIMS NOT SUBMITTED WITHIN THE TIME SPECIFIED.*

*M. SPECIAL PROVISIONS*

*...*

*2. TIME BAR NOTICE FULLY DOCUMENTED*
- *DEMURRAGE: 90 DAYS FULLY DOCUMENTED*
- *ALL CLAIMS: 90 DAYS"*

<u>Jurisdiction</u>

6.   It was the Charterers' original case that they never signed the Asbatankvoy charterparty dated 24th April 2003 and in particular did not agree the arbitration clause and/or did not agree that any arbitration should be conducted in accordance with the LMAA Terms (2002). They admitted the existence of a contract with the Owners but argued that the contract was not that contained in the charterparty dated 24th April 2003 but was set out in the correspondence between the parties (which was, however, never produced to us).

7.   In their rejoinder submissions they argued that they had never agreed the terms as set out in the fixture e-mail of 24th April 2003 from the brokers W.K. Shipping, which was not sent to them but to Mr. Yuan Yang at China National United Oil Corporation. They also argued that W.K. Shipping were the Owners' brokers and had no authority to act for them.

8.   We carefully considered the Charterers' arguments. It was apparent from the Certificate of Weight that China National United Oil Corporation were the consignees of the cargo. The fixture e-mail of 24th April 2003 was sent to a Mr. Yuan Yang at China National United Oil Corporation. However, it

– 5 –

transpired that Mr. Yuan Yang also represented the Charterers, Glasford Shipping, as was apparent from a fax from Heng Xin Law Office's on 27th August 2003 addressed to him at Glasford Shipping, without any complaint or protest being raised at the time.

9.  The Charterers did not adduce any fixture telexes and there was no evidence from them as to what they said the terms of the contract were – if not those set out it the charterparty and fixture e-mail of 24th April 2003. The central difficulty with the Charterers' argument was that the contract set out in the fixture e-mail of 24th April 2003 appeared to have been performed in accordance with that agreement. The cargo as described therein was loaded at Kazim and Bunga Kekwa and discharged at Jinzhou against the agreed freight rate. Although the pre-fixture exchanges were not before us – apart from that of 24th April 2003 – we accepted the Owners' argument that the chartering of the vessel was done by Mr. Yuan Yang of the consignees China National United Oil Corporation (who presumably nominated Glasford as the Charterers) and Mr. Cui Bo for the Owners Nanjing Transportation Co. Ltd. through W.K. Shipping who acted as intermediate shipbrokers.

10.  With reference to the incorporation of the LMAA Terms, both arbitrators expressly accepted appointment on the basis of those Terms. Whilst the clause referred to the appointment of three arbitrators, both parties very sensibly agreed in writing that it was not necessary to appoint a third arbitrator - provided the first two arbitrators appointed were in agreement.

Time bar

11.  It was the Charterers' case that the Owners' claims were time-barred. They relied on clause 4 of the China Oil Clauses and clause M2 of the Special provisions. It is convenient to repeat these provisions here:

– 6 –

*"CHINA OIL CLAUSES NO. 1-18*

*...*

*4. AMOCO CLAIMS CLAUSE – 90 DAYS*
*OWNERS AGREE TO INVOICE CHARTERERS FOR ALL CHARGES AND CLAIMS*
*ARISING FROM THIS CHARTER PARTY, INCLUDING BUT NOT LIMITED TO,*
*DEMURRAGE, DEADFREIGHT, DEVIATION AND SHIFTING, WITHIN NINETY*
*(90) DAYS FROM THE COMPLETION OF DISCHARGE. CHARTERERS WILL NOT*
*BE RESPONSIBLE FOR ANY CHARGES OR CLAIMS NOT SUBMITTED WITHIN*
*THE TIME SPECIFIED.*

*M. SPECIAL PROVISIONS*

*...*
*2. TIME BAR NOTICE FULLY DOCUMENTED*
- *DEMURRAGE: 90 DAYS FULLY DOCUMENTED*
- *ALL CLAIMS: 90 DAYS"*

12.   The Charterers argued that any and all claims should be lodged within 90
      days of completion of discharge on 16th May 2003. It was their case that
      they did not receive any claim by July 16th 2003 and, in the circumstances,
      the Owners either waived their claim and/or the claim was time-barred in
      any event.

13.   It was the Owners' case that, as their claim was for an indemnity, the time
      limit only ran from when it became liquidated or ascertainable – which was
      when the underlying claim had been settled or determined. That (they
      argued) did not happen until the outcome of the mediation before the
      Wuhan Maritime Court on 12th April 2005 and the time limit could only
      start to run from then, as it was only then that the claim was capable of
      being ascertained.

14.   However, they argued that whilst they could not ascertain the extent of the
      claim until 12th April 2005, they had given the Charterers ample notice of
      the likelihood of a claim. The Master's "Extend Sea Protest" dated 14th May
      2003 was the first notice of claim. Thereafter, a notice of losses was given

– 7 –

to the Charterers and their brokers by the Owners' P&I Club on 22nd May 2003. This stated, inter alia, as follows:

> "We understand that charterer in the c/p is GLASFORD SHIPPING LIMITED (Hong Kong), if there are any claims against the owners for shortage and owners loss the case in Chinese court, shipowners no doubt would proceed arbitration with the charterer Glasford Shipping Limited in according to the c/p for compensation.
>
> ...
>
> Any comments, please raise. Please treat this as a formal notification of claim for the shipowners against the charterer Glasford Shipping Limited. We wish the above claim could be settled smoothly between the seller and buyer without the need to incur any unnecessary cost of the shipowners as they have already incurred some unnecessary cost and expenses on surveyors, LOU bail fee, correspondent fee etc. which are reimbursable from the charter."

15.  It was thus apparent that the Owners formally presented a claim well within the 90 day period. Further, irrespective of the "Extend Sea Protest" issued by the Master - which the Charterers said they did not receive - ullage reports at both load and discharge ports reflected the presence of free water in the cargo. Indeed at discharge there was a joint survey by Dalian Sanlian Survey Service Ltd. on behalf of the Owners/their P&I Club (the UK P&I Club), together with a local CIQ surveyor on behalf of the receiver and an ITS surveyor on behalf of the Charterers. As noted above, this found 8,816 bbls of free water in the Walio Crude Oil but none in the Kekwa Crude Oil, which would suggest that the water settled out from the former cargo rather than being introduced by the ship.

16.  We carefully considered the position and agreed with the Owners that the claim was not time-barred. The clause required the Owners to "invoice" the Charterers for all charges and claims within 90 days of completion of discharge. As this was an indemnity claim the Owners clearly could not "invoice" the Charterers with a quantified claim until the underlying claim had been ascertained. The Owners did, however, promptly and within 90

- 8 -

days advise the Charterers of the nature of the claim and gave notice that they would be claiming compensation. The clause fell to be construed *contra proferentem* and, although in the first part of the clause it refers to an invoice, the barring provision does not and, on a true construction of the clause, we therefore considered it sufficient that the Owners had made a claim in the manner just described. In the circumstances, we concluded that the claim was not time-barred.

17.  In the light of that finding it was not necessary for us to consider the Owners' additional argument based on the suggestion that the 90 days might run from the date of the mediation award.

## Was there free water in the cargo at the load and discharge ports?

18.  It was the Owners' case that there was free water in the cargo as revealed by the ullage reports at the load and discharge ports. The Charterers denied that there was any free water in the cargo on completion of loading but, if there was, it was irrelevant because the quantity revealed on the bills of lading did not include the alleged 731 bbls of free water.

19.  In relation to the discharge port, they protested that no reliance could be placed on the ullage survey performed by the Dalian Sanlian Survey Service Ltd. (the "DSSS report"). This they said was not a joint survey as it had not been signed by the CIQ surveyor for the receivers and the ITS surveyor representing the Charterers. In their submission the report was therefore unreliable and unrepresentative.

20.  We were not persuaded that the DSSS report was either (i) unreliable or (ii) unrepresentative. It was apparent from the DSSS contemporaneous report of May 19th that *"other surveyors"* concerned with the matter were in attendance. Indeed it said:

– 9 –

21.    They gauged the quantity of free water on board at 8,817 bbls.  There was no other evidence before us to contradict the DSSS report and in the circumstances we accepted it.

### How did the excess water get into the cargo?

22.    It was the Owners' case that the free water found in the cargo on discharge was present in the cargo on loading.  Although the ullage report on loading only reflected 731 bbls in the cargo, this was because the remainder found on discharge (i.e. an additional 8,086 bbls) had yet to settle out.  The Master protested about both the presence of the free water and the possibility that it would settle out more en route.  At the discharge port samples of the free water were taken by the DSSS surveyor before discharging from ship's cargo tanks 2C, 5C and 6C (which carried the Walio Crude) and after discharging into the shore tanks.  All revealed a salt content of considerably less than 1%.

23.    The DSSS report concluded:

> "5. OUR OPINIONS
>
> Prior to loading, Ship's tanks were checked and no water was found.  This fact was stated in OBQ Report issued at loading port.  Note that loading was completed at 0215 Hrs LT on April 29, 2003 and ullaging was commenced at 0420 Hrs LT on the same day.  No enough time was allowed for the free water in the cargo to settle before gauging the tanks.
>
> The Captain had issued a protest of Water in Cargo Tanks at the loading port dated on 29th of April 2003, and stated that free water of Walio Crude Oil found in the cargo tanks No.2C, 5C and 6C was 731 Bbls in total.  This fact was stated in Ullage Report issued at loading port.  Hence it is possible that free water quantity in the vessel's cargo tank may increase at the discharge port, when the water has settled out during the voyage.

- 10 -

> *As per our gauging when the vessel get alongside at Jinzhou Port, totally 8817 BBLS free water was found in Walio Crude Oil in cargo tanks No. 2C, 5C, 6C and Slop S. And nil free water found in Bunga Kekwa Crude Oil onboard.*
>
> *Compared the ullage calculation at the discharging port with the loading port calculation, we found the T.C.V. was nearly same as in the loading port. The main ullage calculation figures we listed as below for your reference.*
>
> ...
>
> *Furthermore, the ballast tanks No. 1-7 P/S was checked by our surveyor by sight and by sound rod jointly with the party concerned for ascertained whether there is any leakage, but without found any abnormal facts that the ballast water leaked into the cargo tanks.*
>
> *In view of the facts above, we are considering that the larger free water was settled out from the cargo during the voyage in result of Walio Crude Oil shortage in net weight at the discharging port."*

24.   The Charterers challenged the DSSS report on the ground that the samples were not taken jointly with the shippers and the Charterers' representatives although they presented no evidence to contradict it. In the alternative, they argued that the DSSS surveyor had not investigated other possible causes which would explain the presence of free water in the cargo.

25.   We were not persuaded by the Charterers' arguments. The evidence before us indicated that (i) free water was found in the Walio cargo at both load and discharge ports but none was found in adjacent cargo tanks containing the Bunga Kekwa crude oil and (ii) the water had a very low salt content – and was thus fresh rather than salt water. No mechanism was suggested by which that amount of fresh water could have been introduced into the cargo on board the ship with the recorded load and discharge port ullages remaining the same. The ballast tanks were jointly inspected and nothing abnormal found. We considered that whilst (theoretically) the presence of water in the cargo could possibly be explained by other factors, there was no evidence before us as to what those other factors might be. We

– 11 –

concluded that the most obvious explanation (indeed the overwhelming probability) was that the water was present in the cargo on loading and settled out in transit.

### Are the Owners entitled to an indemnity?

26.   It was the Owners' case that they were entitled to an implied indemnity from the Charterers in respect of their liability to the receivers which resulted from the misdescription of the cargo on the bills of lading. The basis of the Charterers' liability (it was said) was either that (i) the Charterers requested the Master to sign the bills of lading and/or (ii) the Charterers impliedly warranted that the statements in the bills of lading were true. The Master had no reasonable means of knowing that the description in the bills of lading was untrue and/or inaccurate and was entitled to rely on the Charterers' assertions that they were accurate. The Owners relied on the decisions in *Elder Dempster v. Dunn* (1909) 15 Com Cas 49 and *"The PAROS"* [1987] 2 Lloyd's Rep. 269 and in *Cooke & Young on Voyage Charters* (3rd Edn) at paragraphs 18.229 *et seq.*  In the alternative, they claimed that they were entitled to damages for the Charterers' failure accurately to describe the weight of the cargo (in other words, a breach of Article III Rule 5 of the Hague Rules).

27.   It was the Charterers' case that the Owners had no claim against them for an implied indemnity and/or for damages. If there was free water in the cargo (they submitted), the Master should have reflected this in the bills of lading; it was his failure to clause the bills that caused the loss. Alternatively, they argued that the Owners' claim lay against the shippers. They said that cargo and the loading of the cargo was not under their control; they only chartered space on the vessel and the limit of their obligation was to provide the cargo and pay freight. To the extent that there was excess water in the cargo, this was a matter for the shippers.

28. We carefully considered the parties' arguments and the authorities referred to. We concluded that whilst the Owners may well have had a separate claim against the shippers, they also had a claim against the Charterers for an indemnity in respect of the liability incurred as a result of the inaccurate statement in the bill of lading on the basis that the shippers were the agents of the Charterers to supply the cargo and to present the bills of lading - see *Cooke & Young* at paragraph 18.230. Furthermore, as the charter incorporated the Hague Rules we concluded that, irrespective of any claim for an implied indemnity, the Charterers would be liable under the guarantee deemed to be given by shippers under Article III Rule 5.

29. That left the question of whether the Master should have claused the bills of lading. There was no evidence before us as to the circumstances in which the bills of lading were signed – save that it would appear on the Charterers' case that the bills of lading did not include the 731 bbls of excess water found on the ullage survey at load port. It was the Charterers' case nevertheless that the Owners, knowing that free water had been found in the cargo, should have claused the bills and/or refused to sign them.

30. We were not persuaded by this. The obligation was on the shippers/Charterers accurately to describe the cargo. As far as the Master was concerned, he signed the bills at the request of the Charterers and as far as he could ascertain they were accurate, given that the quantity on the bills did <u>not</u> include the 731 bbls of excess water found on the ullage survey. Whilst he clearly had reservations about the <u>possibility</u> of the cargo further settling out – in respect of which he issued his "Extend Sea Protest" - this was not something he could either be sure of and/or measure and/or know the extent of.

31. On a practical basis it is difficult to see how, even if the Master were convinced that further water would settle out of the cargo, he could have accurately foreseen what the ultimate water content would be. Again on a

- 13 -

practical basis, he would have been under intense pressure from the shippers/Charterers not to clause the bills. The weight of the cargo and its characteristics were the responsibility of the shippers/Charterers who provided and sold the cargo and it was their obligation accurately to describe it. It was not an obligation that they were entitled to transfer or delegate to the Master. Moreover the shippers/Charterers were, or should have been, in a better position than the Master to know what the actual characteristics of the cargo were. In the circumstances we concluded that the Owners were entitled to damages for the Charterers' breach in relation to the inaccurate description of the cargo.

## Were the Owners volunteers?

32. It was the Charterers' case that the Owners payment to subrogated underwriters following mediation in the Wuhan Maritime Court was an *ex gratia* payment in respect of which they had no legal liability to pay. As such (it was said) the Owners could not recover from the Charterers by way of damages and/or an indemnity. The basis of their argument was that the cause of the loss of cargo was inherent vice for which the Owners are of course relieved from liability under the Hague Rules.

33. We agreed with the Owners that there was no question of their having acted as volunteers or of having made an *ex gratia* payment. Their decision to settle the case for RMB 680,000, roughly 50% of the claimed amount of US$169,765.70, was a reasonable and sensible decision given that this was a claim for short landing in respect of which (i) there was no evidence that an inherent vice defence would succeed, (ii) costs are irrecoverable in China and (iii) the Owners were advised by their lawyers that they would not succeed in avoiding liability.

- 14 -

## Quantum

34.    In addition to the settlement amount of RMB 680,000, the Owners claimed US$43,769 for the costs of their lawyers, Heng Xin Law Office, together with US$6,280 in respect of the costs of their P&I Club correspondents and surveyors' fees. Such costs are, in principle, recoverable as a matter of English law if they have been reasonably incurred in defending the action brought by the third party. Here the defence of the action and the mediation resulted in a reduction of 50% of the claimed amount. We conclude that, just as the settlement figure itself was reasonable, so too were the costs incurred in reaching it. In the circumstances we have additionally awarded to the Owners as damages the costs of their lawyers, Club correspondents and surveyors in the total sum of US$50,049.

35.    The Charterers also argued that they were not liable for any BS&W content of or below 0.3% because that BS&W content was recorded on the bills of lading. However, as the Owners pointed out, 0.3% represented 660 bbls. There were 8,817 bbls of water found in the cargo on discharge and the claim was settled for roughly 50% of the claim. In the circumstances we agreed with the Owners that there was no question of over-compensation.

## Conclusion

36.    The Owners have succeeded in fully recovering their claims for (i) RMB 680,000 and (ii) US$50,049 in relation to their legal, P&I and survey costs. The Charterers did not raise any counterclaim. In the circumstances and, in line with the usual rule that costs follow the event, we have awarded the Owners the costs of this Award and their own costs and have reserved jurisdiction to decided the quantum of those costs in the unfortunate event that they cannot be agreed.